UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-81316-CIV-MATTHEWMAN

JASON R. MCGEE,

                    Plaintiff,

v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security Administration,

                    Defendant

_____/



## **ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 28, 29]**

THIS CAUSE is before the Court upon Plaintiff, Jason R. McGee's ("Plaintiff") Motion for Summary Judgment [DE 28], and Defendant, Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 29]. The motions are fully briefed [DEs 30, 31] and are ripe for review. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. **FACTS**

On July 28, 2017, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on June 24, 2017. [R. 17].[2] The claims were denied initially and upon reconsideration. [R. 15]. Following a hearing on June 13, 2019, the

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. 405(g).

[2] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 21.

Administrative Law Judge ("ALJ"), Wendy Hunn, issued a decision on August 1, 2019, denying Plaintiff's request for benefits. [R. 17–26]. A request for review was filed by Plaintiff with the Appeals Council and denied on June 10, 2020. [R. 1–6].

### A.   Hearing Testimony

The ALJ held a hearing on June 13, 2019, during which Plaintiff was represented by an attorney. [R. 33]. Plaintiff was 48 years old at the time of the hearing. [R. 36]. His testimony established the following facts.

Plaintiff completed his associate degree [R. 37]. From February 2019 through the date of the hearing, he was working for a retirement community, driving people around in vehicles to places like the grocery store and doctors' offices. [R. 37]. He was only working about 15 hours per week and making $12 per hour. [R. 37]. He only worked on a part-time basis because he could not "really handle full-time." [R. 37].

In the past, Plaintiff held several other jobs. [R. 37–38]. At some time after June 24, 2017, he drove vehicles from place to place for another company on a part-time basis. [R. 37–38]. Prior to June 24, 2017, he worked as a computer specialist for about six months. [R. 38]. He helped users with computer problems, imaged computers, ordered supplies and components, and worked on printers. [R. 38]. Plaintiff has also worked as an IT support assistant, support tech, and regional IT admin. [R. 38]. For each of these jobs, Plaintiff sat for a while and then had to stand. [R. 38]. He had to lift and carry up to 20-25 pounds. [R. 39]. Back in 2011, Plaintiff was a service advisor at an auto dealership. [R. 39]. He helped customers who came to get work done on their cars. [R. 30]. He also worked for about two months as a service appointment coordinator, setting up appointments. [R. 39]. The two auto dealership jobs involved sitting and walking around a lot. [R.

2

39]. In 2008, Plaintiff was a parts counter person, looking up parts for customers on the computer and billing, locating, shipping, receiving, delivering, and ordering parts and inventory. [R. 40]. He had to lift or carry up to 40-50 pounds. [R. 40]. Finally, Plaintiff was an AV maintenance tech/sales representative for a couple of months. [R. 40]. He did tune ups on air conditioning systems and tried to upsell what the customer needed. [R. 40]. Plaintiff had to lift or carry up to 15-20 pounds. [R. 41].

Plaintiff cannot work full time because he gets crippling panic attacks that can occur at any time without warning. [R. 41]. The panic attacks prevent him from functioning and interfere with his concentration and memory. [R. 41]. When he is not having panic attacks, Plaintiff has general anxiety which makes it hard to concentrate, think, and remember things. [R. 41]. He believes he was terminated from his computer specialist position because of his issues focusing, although he was never provided with a specific reason. [R. 41].

When Plaintiff gets panic attacks, he gets a warm feeling all over his body. [R. 42]. The panic attacks can happen multiple times in a given day or he may go three days without any panic attacks. [R. 43]. The attacks last anywhere from 10 minutes to two hours. [R. 43]. They cause a "tense, horrible feeling." [R. 43]. Plaintiff either waits for the panic attacks to pass or takes his Klonopin as needed, which works in about an hour or so. [R. 43]. He has had panic attacks during his current job, but not as much as in the past with other jobs. [R. 43–44].

Plaintiff is also being treated for general anxiety and a mood disorder. [R. 44]. He has tried many different medications to see which ones work best. [R. 44]. Certain medications have not seemed to make a difference or have made him feel worse, and he has quit taking some. [R. 44–45]. ADHD medications made him feel even more anxious, so he stopped taking them. [R. 45]. At

the time of the hearing, Plaintiff was taking Lexapro, Klonopin, and Wellbutrin. [R. 46]. These medications do not make Plaintiff feel tired, but they also do not work as well with anxiety and panic. [R. 46–47]. Plaintiff also uses "reading techniques, realization techniques." [R. 44]. He suffers from general nervousness, a racing heart a lot of the time, and an inability to concentrate, think, or focus. [R. 47]. Plaintiff's doctor at Compass Health has to constantly adjust his medications since his condition keeps adjusting as well. [R. 47]. Plaintiff had one skin cancer and now goes back to Waters Edge Dermatology every six months to check his skin. [R. 48].

Plaintiff has a professional relationship with Lee Beck. [R. 49]. She is a therapist who Plaintiff saw for months or even a year. [R. 49]. He stopped seeing her when she went on maternity leave. [R. 49]. Plaintiff had a new therapist at the time of the hearing who he had been seeing since about October 2018. [R. 49]. He did not see the therapist much because he had trouble getting therapy appointments. [R. 49]. His last visit was around April 2019. [R. 49]. Plaintiff did not provide the records from the new therapist prior to the hearing, but his counsel was trying to obtain them. [R. 50].

James Newton, the vocational expert ("VE"), testified at the hearing. [R. 51]. He classified Plaintiff's past relevant work. [R. 51]. The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff had no exertional limitations but had the following non-exertional limitations: only simple, routine, repetitive tasks; no forced pace or assembly line work, teamwork, or working in tandem with others; and only occasional interaction with co-workers and only occasional face-to-face interaction with the general public. [R. 51]. The VE stated that no past relevant work could be performed. [R. 52]. However, he also stated that such an individual could perform the following unskilled jobs: laundry worker, cleaner, and

garment sorter. [R. 52]. The vocational expert also stated how many of each type of job exists nationally. [R. 52]. For the ALJ's next hypothetical, he added to the first hypothetical that the individual would be absent from work at least two days every month. [R. 52]. The VE explained that the three jobs he previously listed would no longer be feasible because employers generally only tolerate one absence per month after the first 90-day probation period. [R. 52].

Plaintiff's counsel questioned the vocational expert next. [R. 52]. Counsel adopted the ALJ's first hypothetical but added that the individual would need to take unscheduled breaks throughout a weekday and would be off task more than 10% of the workday on a regular and consistent basis. [R. 52–53]. The VE testified that such an individual would not be able to sustain competitive employment. [R. 53]. He also testified that an acceptable tolerance for off task time by employers is up to 10% of the workday. [R. 53].

## B.   Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, only the relevant portion of which is summarized chronologically below.

Plaintiff periodically saw Dr. Mark Agresti from 2004 through 2013. [R. 305-318]. While the majority of Dr. Agresti's notes are illegible, he did note on December 6, 2013, that, before Plaintiff started taking Klonopin in June, he had three or four panic attacks per week which could last more than 12 hours. [R. 306]. With the medication, Plaintiff was only having three or four panic attacks per month. [R. 306]. Dr. Agresti also noted in December 2013 that Plaintiff was clean, neatly dressed, and anxious, with average, broad, and organized thought content. [R. 306].

Plaintiff presented to Dr. Javedul Haque at The Clinic LLC on September 1, 2016. [R. 395]. At that time, he was on Lexapro, Effexor, and Klonopin and reported that the medication

was working, and he was working full-time. [R. 395]. Plaintiff also stated that, at times, he suffered from depression and anxiety. [R. 395]. Dr. Haque conducted a mental status examination and noted that Plaintiff was casually groomed and dressed, cooperative, had good eye conduct, was alert and oriented, had good attention and concentration, had intact memory, was mildly dysphoric and anxious, had normal speech, had logical and comprehensible thought process, was preoccupied with social stressor/mental illness but had no suicidal or homicidal ideation or paranoid delusion, had no hallucinations, and had good impulse control, insight, and judgment. [R. 397]. Dr. Haque diagnosed Plaintiff with major depressive disorder, recurrent and moderate; panic disorder without agoraphobia; and generalized anxiety disorder. [R. 397]. Dr. Haque determined that outpatient care was sufficient. [R. 397]. Plaintiff stated that he planned to try to obtain disability benefits. [R. 398]. Dr. Haque continued Plaintiff on the Effexor, Lexapro, and Klonopin. [R. 398].

On January 16, 2017, Plaintiff presented to Dr. Mark Giordano at Compass Health Systems. [R. 431]. Plaintiff reported feeling tired all of the time and continuously hearing ringing in his ears. [R. 431]. Dr. Giordano completed a mental status exam and noted that Plaintiff had a worried affect, increased appetite, and decreased energy, but all other findings were normal. [R. 431-432]. For Plaintiff's panic disorder without agoraphobia, Dr. Giordano decreased the prescribed Venlafaxine and continued the Klonopin. [R. 432].

Plaintiff returned to Dr. Giordano on February 13, 2017, for a routine follow-up. [R. 428]. He reported that he was compliant with medications, easily agitated, and angry that he was still gaining weight after discontinuing Lexapro. [R. 428]. Plaintiff also stated that he was getting no relief on Venlafaxine, still got panic attacks, and was taking Klonopin every two or three days. [R. 428]. Upon examining Plaintiff, Dr. Giordano noted that he was irritable and agitated. [R. 428].

Dr. Giordano stopped Venlafaxine, continued Klonopin, and started Lexapro and Abilify. [R. 429].

Plaintiff saw Dr. Haque again on May 3, 2017. [R. 391]. Plaintiff reported that he was not taking his Effexor. [R. 391]. He also reported that he was seeing another psychiatrist and was on Lexapro and Abilify. [R. 391]. Plaintiff further stated that he was doing better on medication but that he had run out of Abilify and started experiencing panic attacks again. [R. 391]. However, he was still working full-time. [R. 391]. After conducting a mental status examination, Dr. Haque prescribed Plaintiff Effexor, Abilify, Lexapro and Klonopin. [R. 394].

Plaintiff presented to Dr. Haque on June 6, 2017. [R. 387]. He wanted to be seen as soon as possible because he had a panic attack. [R. 387]. He reported doing fine until he experienced that panic attack. [R. 387]. Plaintiff was taking his medication as prescribed and was still working full-time. [R. 387]. Dr. Haque increased Plaintiff's Lexapro and refilled his Abilify and Klonopin prescriptions. [R. 389].

On August 1, 2017, Plaintiff saw Kandace Eagle, ARNP, with Compass Health Systems for a medication refill. [R. 425]. Plaintiff reported that his mood and sleep had been stable but that he had a decreased appetite. [R. 425]. Plaintiff also explained that he increased his Lexapro dose on his own. [R.425]. Plaintiff's Klonopin and Lexapro were refilled, and he was started on Buspirone. [R. 426].

Plaintiff's mother completed a Function Report-Third Party on September 21, 2017. [R. 222–229].

On September 22, 2017, Plaintiff again saw Kandace Eagle, ARNP for medication management. [R. 422]. He reported that he stopped taking Buspirone because he "read up about it," that he was seeking full disability, and that his anxiety was such that he was unable to keep a

job. [R. 422]. Plaintif's Lexapro and Klonopin prescriptions were refilled. [R. 423].

In a Disability Determination Explanation at the Initial Level dated November 1, 2017, Dr. Heather Bradley Ph.D., found that Plaintiff suffered from the medically determinable impairments of anxiety and obsessive-compulsive disorders; depressive, bipolar, and related disorders; and trauma and stressor-related disorders. [R. 69]. Dr. Bradley determined that Plaintiff had mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others, adapting, or managing oneself, and concentrating, persisting or maintaining pace. [R. 70]. Dr. Bradley determined that the evidence did not establish the presence of the "C criteria." [R. 70]. Dr. Bradley found that Plaintiff's allegations were partially consistent with the record evidence, as there were signs of medically determinable impairments, "but not to a severe or disabling degree." [R. 70]. She further found that Plaintiff "appears to have up to moderate limitations in functioning, based on mental impairments. Although the claimant's case is more than not severe, it does not meet or equal any listing." [R. 70]. Dr. Bradley did note that Plaintiff has "sustained concentration and persistence limitations" and "social interaction limitations." [R. 71].

In conducting her mental functional capacity assessment, Dr. Bradley determined that Plaintiff is not significantly limited in his understanding and memory; his ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. [R. 71–73]. Dr. Bradley determined that Plaintiff has moderate limitations in his ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. [R. 72–73]. Dr. Bradley explained that Plaintiff's "mental impairments appear to impose some work related limitations, but do not preclude all work. The claimant is able to meet the mental demands of a simple vocation on a sustained basis, despite the limitations resulting from any impairment." [R. 73]. The Disability Adjustor/Examiner, Stella J. Morris, concluded that Plaintiff is limited to unskilled work due to his mental impairments, with no exertional limitations. [R. 74]. Ms. Morris found that Plaintiff is not disabled since he can work at three occupations in which there are a significant number of jobs that exist in the national economy (lens cleaner, lens inserter, and sorter). [R. 75].

On November 2, 2017, Plaintiff again saw Kandace Eagle, ARNP at Compass Health Systems. [R. 419]. He reported that he stopped taking Busiperone and Abilify as he thought they were making his symptoms worse. [R. 419]. Plaintiff explained that he thinks he has ADHD and reported having a hard time with focus and attention. [R. 419]. According to Plaintiff, he was

unable to finish projects and was easily distracted. [R. 419]. Additionally, since he had trouble focusing at work, it was hard to hold a job. [R. 419]. ARNP Eagle refilled Plaintiff's Klonopin and Lexapro prescriptions and prescribed Vyvanse for ADHD. [R. 420].

On December 1, 2017, Plaintiff again saw Kandace Eagle, ARNP. [R. 416]. He stated that the Vyvanse had increased his anxiety and that he could not work any way so it was difficult to determine if the drug had helped him focus. [R. 416]. ARNP Eagle continued Plaintiff's Lexapro and Klonopin prescriptions. [R. 417]. She also stopped the Vyvanse and prescribed Methylphenidate for the ADHD. [R. 417].

On December 1, 2017, Leah Beck, a Licensed Mental Health Counselor, completed a Mental Capacity Assessment. [R. 412–414]. She noted that Plaintiff had been diagnosed with panic disorder without agoraphobia and ADHD, inattentive type. [R. 412]. LMHC Beck checked the boxes on a form and found that Plaintiff suffered from marked limitations in the ability to follow one- or two-step oral instructions to carry out a task; the ability to recognize a mistake and correct it, or identify and solve problems; the ability to manage psychologically based symptoms; the ability to respond to requests, suggestions, criticism, correction and challenges; and the ability to keep social interaction free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. [R. 412–414]. She found that Plaintiff had moderate limitations in the ability to sequence multi-step activities; the ability to work at an appropriate and consistent pace, or complete tasks in a timely manner; the ability to distinguish between acceptable and unacceptable work performance; and the ability to set realistic goals. [R. 412–414]. LMHC Beck opined that Plaintiff had mild limitations in the ability to use reason and judgment to make work-related decisions; the ability to ignore and avoid distractions while working; and the ability to work a full

day without needing more than the allotted number or length of rest periods during the day. [R. 412–414]. For all other areas, LMHC Beck either checked that Plaintiff had no limitations or had unknown limitations. [R. 412–414]. In coming to these conclusions, LMHC Beck noted various statements made to her by Plaintiff. [R. 412–414].

In a Disability Determination Explanation at the Reconsideration Level dated January 23, 2018, Dr. David Tessler Ph.D., found that Plaintiff suffered from the medically determinable impairments of anxiety and obsessive-compulsive disorders and depressive, bipolar, and related disorders. [R. 83]. Dr. Tessler determined that Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; adapting or managing oneself; and concentrating, persisting or maintaining pace. [R. 83]. Dr. Tessler determined that the evidence did not establish the presence of the "C criteria." [R. 83]. Dr. Tessler found that Plaintiff's allegations were partially consistent with the record evidence, as there were signs of medically determinable impairments, "but not to a severe or disabling degree." [R. 83]. He further found that Plaintiff "appears to have up to moderate limitations in functioning, based on mental impairments. Although the claimant's case is more than not severe, it does not meet or equal any listing." [R. 83]. Dr. Tessler stated that the medical source opinion from Leah Beck "is not persuasive as she is not an acceptable source and her opinion is not consistent w/ objective evidence. I have reviewed all the evidence on file and agree with the initial PRT/MRFC as written except there appears to be moderate not mild limitations with understanding and memory." [R. 83]. Dr. Bradley did note that Plaintiff has "sustained concentration and persistence limitations" and "social interaction limitations." [R. 84].

In conducting his mental functional capacity assessment, Dr. Tessler determined that

Plaintiff is not significantly limited in his ability to remember locations and work-like procedures; the ability to understand, remember, and/or carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. [R. 85–86].

Dr. Tessler determined that Plaintiff has moderate limitations in his ability to understand, remember, and/or carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. [R. 85–86]. Dr. Tessler explained that Plaintiff's "mental impairments appear to impose some work related limitations, but do not preclude all work. The claimant is able to meet the mental demands of a simple vocation on a sustained basis, despite the limitations resulting from any impairment." [R. 87]. The Disability Adjustor/Examiner, Amadiere Zuofa, concluded that Plaintiff is limited to

unskilled work due to his mental impairments, with no exertional limitations. [R. 88]. Ms. Zuofa found that Plaintiff is not disabled since he can work at three occupations in which there are a significant number of jobs that exist in the national economy (lens cleaner, lens inserter, and sorter). [R. 88].

Plaintiff presented to Dr. Tanveer Sobhan at Compass Health on February 7, 2018, for a follow up and a medication refill. [R. 510]. Plaintiff reported that his ADHD symptoms were stable due to medication management. [R. 510]. Dr. Sobhan continued the Klonopin and Lexapro and increased the Methylphenidate dose. [R. 511]. Plaintiff saw Dr. Sobhan against on March 7, 2018, and reported that he was stable on his medication but that he had to cut his Methylphenidate dose in half due to anxiety. [R. 507]. Dr. Sobhan continued the Klonopin and Lexapro, stopped the Methylphenidate, and prescribed Adderall for Plaintiff's ADHD. [R. 508]. On April 14, 2018, Plaintiff reported to Dr. Sobhan that he had not taken the Adderall yet and may not take it. [R. 503]. Plaintiff also reported feeling fewer emotions with his Lexapro dose. [R. 503]. Dr. Sobhan decreased the Lexapro dose. [R. 505].

On May 17, 2018, Plaintiff presented to Dr. Daniel Stein Lifshitz at Compass Health. [R. 500]. Plaintiff had no new complaints and had not taken Adderall. [R. 500]. Dr. Lifshitz increased Plaintiff's Lexapro dose. [R. 501]. Plaintiff saw Dr. Lifshitz again on June 19, 2018. [R. 496]. Dr. Lifshitz continued the Klonopin, decreased the Lexapro, started Trintellix, and stopped all ADHD medication. [R. 498–499]. Plaintiff saw Dr. Lifshitz on July 31, 2018 and stated that he was stable on his medications but that he had started Trintellix a month ago, was not sure it was working, and was concerned about the cost of the medication. [R. 492]. Dr. Lifshitz continued the Trintellix, Klonopin, and Lexapro. [R. 494]. On October 23, 2018, Dr. Lifshitz refilled Plaintiff's Klonopin,

Lexapro, and Rexulti. [R. 490]. On November 18, 2018, Plaintiff told Dr. Lifshitz that he was stable, and Dr. Lifshitz continued the Klonopin and Lexapro and increased the Rexulti. [R. 485, 487].

Plaintiff presented to Dr. Sobhan at Compass Health on February 11, 2019. [R. 482]. He reported weight gain and feeling tired. [R. 482]. Dr. Sobhan continued the Lexapro, Rexulti, and Klonopin. [R. 484]. On March 11, 2019, Plaintiff reported to Dr. Sobhan that he believed his medication was making him sleepy. [R. 526]. However, he stated that the Rexulti was controlling his panic attacks. [R. 526]. Dr. Sobhan continued the Lexapro, Rexulti, and Klonopin. [R. 527]. Finally, Plaintiff saw Dr. Sobhan on April 8, 2019, for medication refills. [R. 523]. Plaintiff reported that he had little drive and motivation. [R. 523]. Plaintiff had a normal mental status exam. [R. 524]. Dr. Sobhan continued the Lexapro and Klonopin. [R. 525]. He stopped the Rexulti and started Bupropion. [R. 525].

## C.   ALJ Decision

The ALJ issued her decision on Plaintiff's claim for benefits on August 1, 2019. [R. 17–26]. The ALJ first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021. [R. 19]. She next found that Plaintiff had not engaged in substantial gainful activity since June 24, 2017, the alleged onset date. [R. 19]. The ALJ determined that Plaintiff has the following severe impairments: mood disorder, panic disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder (ADHD). [R. 19]. Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 20]. The ALJ determined that Plaintiff had the following Residual Functional

Capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant retains the capacity to perform simple, routine, and repetitive tasks. There should be no forced pace or assembly line work. He can have occasional interaction with coworkers and occasional face-to-face interaction with the general public. There should be no teamwork or working in tandem with others.

[R. 21].

The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 21]. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements about intensity, persistence and the limiting effects of his symptoms were "somewhat inconsistent" with the objective medical evidence. [R. 22].

The ALJ noted the "substantial overlap in a symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses." [R. 22]. She explicitly considered Plaintiff's "psychological symptoms and their effect on functioning together, instead of separately, regardless of the diagnostic label attached." [R. 22]. The ALJ summarized the record evidence. [R. 22–23]. She found the opinions of Leah Beck, LMHC, to not be persuasive because they are inconsistent with the totality of the evidence received at the hearing level and with the treatment records. [R. 23]. The ALJ then concluded that the prior administrative medical findings are not persuasive" because they were "somewhat equivocal and did not define precise functional limitations, which renders this evidence less persuasive." [R. 23]. The ALJ explained that "[w]hile the state agency medical consultants supported their findings with an explanation, the totality of the evidence is consistent with somewhat different limitations." [R. 23].

The ALJ concluded that Plaintiff is unable to perform any past relevant work. [R. 24]. The ALJ explained that Plaintiff was a younger individual on the alleged disability onset date, has at least a high school education, and is able to communicate in English. [R. 24]. The ALJ noted that transferability of jobs skills was not material to the determination of disability "because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." [R. 24]. The ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including laundry worker, cleaner, and garment sorter, and relied on the vocational expert's testimony. [R. 25]. She found that Plaintiff has not been under a disability from June 24, 2017, through the date of the decision. [R. 26].

## II. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In his Motion for Summary Judgment, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate the opinion of treating medical source Leah Beck, LMHC. [DE 28]. In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, Defendant asserts that the ALJ properly evaluated LMHC Beck's medical opinion under the revised medical evidence regulations, and substantial evidence supports her finding that the opinion is not persuasive. [DE 29].

## III. <u>RELEVANT LAW</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a

16

reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (alteration in original) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)–(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix 1. Certain impairments are

so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpart P, appendix 2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239–40.

Review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004) (quoting

18

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining [that] the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

## IV. <u>ANALYSIS</u>

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because she failed to properly evaluate the opinion of treating medical source Leah Beck, LMHC. [DE 28 at 8]. She contends that the "examination findings cited by the ALJ were conducted in a controlled medical clinic and thus did not reflect Plaintiff's mental impairments as they relate to work," and this is improper and contrary to the case law. *Id.* at 10. According to Plaintiff, "LMHC Beck's opinion was consistent with Plaintiff's symptoms and the ALJ was aware that panic attacks are usually triggered by stressful environments. Thus, the ALJ's over reliance on mental status examinations in a controlled medical office setting do[es] not support her determination." *Id.* at 11. Plaintiff further asserts that certain record evidence relied on by the ALJ actually was consistent with LMHC Beck's opinion that Plaintiff could not handle full time work. *Id.* Plaintiff points out that the ALJ also found the opinion of the State Agency consultants to be unpersuasive, but, in doing so, improperly substituted her lay opinion for the medical opinion of experts. *Id.* at 12.

20

Plaintiff contends that "[t]he failure of the ALJ to properly evaluate the opinion of LMHC Beck is harmful because she proffered disabling limitations." *Id.* In other words, "if properly evaluated the limitations opined by LMHC Beck would satisfy two marked limitations. As such Plaintiff would meet listing 12.04, 12.06 or 12.11. Therefore, Plaintiff would be found disabled." *Id.*

In response, Defendant argues that the ALJ properly evaluated the persuasiveness of LMHC Beck's medical opinion under the revised medical evidence regulations as she "correctly considered and applied the supportability and consistency factors set forth in those regulations and found the opinion 'not persuasive.'" [DE 29 at 7]. Plaintiff further contends that substantial evidence supports this finding. *Id.* Defendant points out that LMHC Beck's "written answers on the check-the-box form, however, generally each begin with the wording the 'patient reported,' suggest[s] that her explanation was not based on examination findings, but rather, primarily on Plaintiff's subjective complaints." *Id.* at 8. Defendant also points out that the record contains no treatment notes from LMHC Beck to support her opinion. *Id.* According to Defendant, the ALJ reasonably concluded that, despite LMHC Beck's explanation, her opinion was inconsistent with the record evidence. *Id.* Defendant explains that the "question is not whether substantial evidence supports Plaintiff's view of LMHC Beck's opinion, but whether substantial evidence supports the ALJ's finding regarding the opinion." *Id.* at 10. Defendant further asserts that the "ALJ was not required to adopt any opinion" and was "not required to base [ ] her RFC finding on a doctor's opinion." *Id.* at 13.

In reply, Plaintiff contends that the ALJ failed to properly evaluate the opinion of treating medical source LMHC Beck, contrary to the regulations and case law. [DE 31 at 1]. Plaintiff argues that "even if LMHC Beck's opinion is based on subjective complaints, that is a proper diagnostic

measure in dealing mental limitations. The opinion of a mental health expert is based on the subjective complaints of a patient coupled with their observations and expertise to reach a functional limitation." *Id.* at 2. Plaintiff asserts that "part time work does not equate to the ability to do sustained work-related activities," and, thus, the ALJ erred in "relying on his part time work to discount the opinion of LMHC Beck." *Id.* at 3. Next, Plaintiff maintains that "LMHC Beck's opinion was consistent with Plaintiff's symptoms and the ALJ was aware that panic attacks are usually triggered by stressful environments." *Id.*

With respect to the medical evidence of record, the Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion" but is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The law regarding how much deference to give treating physicians has changed for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed after March 27, 2017. The new regulations, which omit entirely the term "treating source," state that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." § 404.1520c(a). Instead, all medical opinions are to be evaluated according to the factors listed in § 404.1520c(c), of which the most important are the supportability and consistency of the medical opinion. *See id.* Moreover, the ALJ is not required to articulate how he or she "considered each medical opinion or prior administrative medical finding from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

Supportability refers to the relevance of "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her" opinion. 20 C.F.R. § 404.1520c(c)(1). Consistency looks to whether "the evidence from other medical sources and nonmedical sources in the claim" are consistent with the medical opinion presented. 20 C.F.R. § 404.1520c(c)(2). The other factors, which the ALJ is not required to consider, § 404.1520c(b)(2), concern the medical source's relationship with the claimant, § 404.1520c(c)(3), the medical source's specialization, § 404.1520c(c)(4), and any "other factors that tend to support or contradict a medical opinion." § 404.1520c(c)(5); *see also Bonilla v. Saul*, No. 19-25323-CIV, 2020 WL 9048787, at *4–5 (S.D. Fla. Oct. 23, 2020), *report and recommendation adopted*, No. 19-CV-25323, 2021 WL 1198296 (S.D. Fla. Mar. 30, 2021).

Thus, under the revised regulations, which the Court is applying in this case, the ALJ must articulate how persuasive he or she finds the medical opinions in the record and specify how he or she considered the supportability and consistency factors for a medical source's opinion. *See* 20 C.F.R. § 404.1520c(b). If the ALJ finds that two or more medical opinions are equally well-supported and consistent with the record but are not necessarily the same, the ALJ must articulate how the ALJ considered other persuasive factors. *See* 20 C.F.R. § 404.1520c(b)(3).

Here, the ALJ explicitly found the opinion of Leah Beck to not be persuasive. [R. 23]. The ALJ explained that, while LMHC Beck supported the opinion with an explanation, the opinion was "totally inconsistent with the totality of the evidence at the hearing level." [R. 23]. The ALJ then discussed the evidence that contradicted LMHC Beck's opinion. [R. 23]. Therefore, the ALJ did sufficiently articulate how persuasive she found LMHC Beck's opinion and did sufficiently specify how she considered the supportability and consistency factors.

The Court could stop here in its analysis, but, in an abundance of caution, also finds as follows. LMHC Beck's opinions were transmitted in the form of a check-the-box evaluation. "[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." *Hammersley v. Astrue*, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009). While these forms are admissible, "they are [generally] entitled to little weight and do not constitute 'substantial evidence' on the record as a whole." *O'Leary v. Schweiker,* 710 F.2d 1334, 1341 (8th Cir. 1983); *Lopez v. Saul*, No. 19-23569-CIV, 2020 WL 7344634, at *9 (S.D. Fla. Aug. 6, 2020), *report and recommendation adopted sub nom. Lopez v. Comm'r of Soc. Sec.*, No. CV19-23569-CIV, 2020 WL 6579787 (S.D. Fla. Nov. 10, 2020). Thus, the LMHC Beck's opinion has limited probative value, is entitled to little weight, and does not constitute substantial evidence.

Even more importantly, <u>NONE</u> of LMHC Beck's treatment notes or records were included in the medical evidence. Therefore, there is no objective evidence as to how many times Plaintiff saw LMHC Beck or what happened at those visits. Even by Plaintiff's own vague account at the hearing, he saw LMHC Beck "quite a bit" for months or possibly a year. [R. 49]. Furthermore, a careful reading of the decision shows that the ALJ did not solely discount the opinion of LMHC Beck because she relied on subjective complaints.

The Court also rejects Plaintiff's argument that the ALJ allegedly failed to consider the fact that the examination findings cited by the ALJ were conducted in a controlled medical clinic and thus did not reflect Plaintiff's mental impairments as they relate to work. The ALJ is not required to explicitly document in her decision every single finding she makes. Additionally, the primary case relied on by Plaintiff, *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1105 (11th Cir. 2021),

involved the old version of the treating physician rule and an ALJ who discounted a treating physician who had provided "extensive" notes "spanning more than thirty meetings with [the claimant] across four years." Plaintiff has simply taken certain quotes from the *Simon* opinion out of context and included them in his Motion for Summary Judgment. The facts in *Simon* are quite different from the facts here. *Simon* is inapplicable to the facts of this case.

Finally, Plaintiff's assertion that the ALJ improperly substituted her lay opinion for the medical opinion of experts is completely without merit. The case cited by Plaintiff for this premise, *Clay v. Comm'r of Soc. Sec.*, No. 19-81103-CIV, 2021 WL 1198300, at *14 (S.D. Fla. Mar. 30, 2021), is inapposite. In *Clay*, a decision authored by the Undersigned, the ALJ "offered bizarre suggestions which, he seemed to believe, would cure her" and thus appeared "to have improperly taken on the role of a therapist or mental health professional at the hearing." *Id.* Nothing of the sort occurred in the case at hand. In sum, upon careful review of the ALJ's decision, the ALJ clearly fully reviewed all of the record evidence and complied with the various social security regulations in coming to her conclusions.

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Court finds that the record contains substantial evidence to support the denial of benefits to Plaintiff. The Court further finds that the ALJ applied the correct legal standards. Thus, the decision of the Commissioner is **AFFIRMED**.

2. Accordingly, Plaintiff's Motion for Summary Judgment [DE 28] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 29] is hereby **GRANTED**.

3. Judgment will be entered separately.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 14th day of June 2022.

WILLIAM MATTHEWMAN
United States Magistrate Judge